# EXHIBIT A

---

# PLAINTIFF'S EXPERT WITNESS REPORT

---

---

*Dominic Castleberry*
*v.*
*JP Morgan Chase Bank, N.A.*

---

Douglas A. Hollon
August 4, 2025

Credit Experts of North Texas, LLC
1101 Mockingbird Dr.
Aubrey, TX 76227

# INTRODUCTION

This Expert Report was prepared pursuant to Federal Rules of Civil Procedure 26(a)(2) regarding the case of **Dominic Castleberry v. JP Morgan Chase Bank, N.A.,** U.S. District Court, Eastern District of Texas (Case: 4:24-cv-00793).

I have been asked to provide an opinion of the Consumer Reporting Information, and other related documents pertaining to Dominic Castleberry, ("Plaintiff" or "Mr. Castleberry") I have also been asked to opine on the "Defendant's," JP Morgan Chase Bank, N.A. ("Defendant" or "Chase"), actions regarding Dominic Castleberry's consumer file/report with said Defendant.

# QUALIFICATIONS AND METHODOLOGY

I am the Owner of Credit Experts of North Texas, LLC. I have worked in the consumer reporting industry since 2005 where I began working with Experian Information Solutions, Inc. Experian is a national Consumer Reporting Agency, with its United States corporate headquarters located in Costa Mesa, CA. During my time at Experian I was based in Allen, TX at the National Consumer Assistance Center (NCAC), now known as My Customer Experience (MCE). This location is the main dispute processing center for Experian. Initially, I assisted consumers with their mail or telephone disputes of items listed on their consumer file. In 2006, I was promoted to Consumer Affairs Special Services (CASS), now known as Experian Consumer Affairs (ECA). In ECA, I handled escalated credit report disputes. These escalated disputes were submitted on consumers by attorneys, State Attorney General's Offices, the Federal Trade Commission, Consumer Financial Protection Bureau, Better Business Bureau, members of Congress, and other government agencies. I also performed duties as the Government Liaison working with Experian's lobbyists, I was responsible for assisting "High Profile Consumers", and I also performed duties as an Alternate Custodian of Records.

In addition to my dispute training, I received specialized training involving fraud (identity theft) disputes and mixed file disputes. I also gained expertise in Experian's database operations, called File One, which is the name of the database used to store the consumer reporting data for the 200 million plus consumers in the United States. While employed at Experian, I was informed by management that I was considered a Subject Matter Expert and that Experian's Law Department designated me as an expert witness. As a result, I served as a company representative witness under Rule 30(b)(6), testifying in approximately 20 Fair Credit Reporting Act (FCRA) cases. My experience and training also included credit scores and score factors enabling me to explain these to consumers, attorneys, federal and state congressmen, State Attorney General personnel, and other government agencies. Furthermore, my experience and training included the review and investigation of Reseller disputes and understanding of information received from Public Record Vendors, including the reliability of that information.

2

Along with my experience with Experian, through the study of regulatory agency publications, case law, deposition transcripts, company manuals or publications, and other related documents, I possess extensive knowledge of other Consumer Reporting Agencies' (CRAs) and Data Furnishers' credit dispute operations. I am well-versed in the policies, procedures, processes, and operations, of Experian, Equifax, TransUnion, Innovis, and other CRAs and Data Furnishers, as well as the rules, regulations, and requirements for complying with the Fair Credit Reporting Act within the industry standards.

While working in the Consumer Reporting Industry, I have assisted tens of thousands of consumers. In 2022, I was invited to speak at a credit convention, along with other credit experts, and in 2024, I was invited to speak at events, speaking alongside banking and mortgage industry personnel, to educate consumers about the Consumer Reporting Industry. Also, as a Credit Expert Witness, I have been qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation.

In addition to my specialized training in the Consumer Reporting Industry, I have earned a Bachelor's of Science Degree in Business Finance from Liberty University, and I have received Fair Credit Reporting Act (FCRA) Certifications (CRAs and Data Furnishers) from the Consumer Data Industry Association (CDIA).[1] Furthermore, I completed a 35-hour training course and earned the Credit Analyst Certificate from the New York Institute of Finance, I have completed over 60 hours and earned the certificates in Credit Risk Modeling and Credit Scorecard Development from SAS Institute, Inc., and I have completed the American Bankers Association Certificate in Lending Compliance for Compliance Professionals.

As an expert, I possess and use specialized knowledge, skills, experiences, training and education, which I apply with a methodology which helps with the trier of fact to understand the evidence and/or facts of a case involving the industry standards of consumer reporting, scores, and the impact of those reports and scores on a consumer's creditworthiness and/or character. Application of my specialized knowledge, skills, experiences, training, education and methodology are to allow a proper frame of reference of consumer reporting, and to evaluate whether the information reported was reported using industry standards, or if the standards were disregarded. Additionally, my analysis and opinions are intended to help the trier of fact to understand the systematization of inaccuracy in Plaintiff's case. Further, another purpose of my specialized knowledge, skills, experiences, training, education, plus methodology, is to help with the trier of fact of damages incurred by Plaintiff regarding creditworthiness and/or character attributable to Defendant's actions/inactions with the reporting of information.

My curriculum vitae is attached to this report.

---

[1] "The Consumer Data Industry Association (CDIA) is the voice of the consumer reporting industry, representing consumer reporting agencies including the nationwide credit bureaus, regional and specialized credit bureaus, background check companies, and others. Founded in 1906, CDIA promotes the responsible use of consumer data to help consumers achieve their financial goals, and to help businesses, governments and volunteer organizations avoid fraud and manage risk." https://www.cdiaonline.org/about/about-cdia/ The CDIA FCRA Certification is a self-paced, interactive online course which is comprised of five training modules and a final exam.

3

## SUMMARY OF OPINIONS

In my opinion, Chase obtained a consumer report from Experian and TransUnion without a permissible purpose.

In my opinion, Chase provided no clear written authorization from Plaintiff which allowed Chase to request and receive consumer reports related to Plaintiff from Experian and TransUnion.

In my opinion, Chase failed to follow the 2011 settlement agreement between itself and Plaintiff by, in October 2023, processing a loan or credit application, which included Chase wrongfully requesting credit reports from Experian and TransUnion, to which the 2011 settlement agreement strictly forbid Plaintiff from submitting a loan or credit application to Chase after the settlement agreement was enacted.

In my opinion, Chase failed to have mechanisms in place, i.e., flagging or notating Plaintiff's file with Chase, to ensure no business activities transpired between Plaintiff and Chase after the 2011 Settlement agreement was enacted.

## INTRODUCTION AND FACTUAL BACKGROUND

In April 2011, Chase and Mr. Castleberry executed a settlement agreement and release as a result of litigation. In the agreement, Mr. Castleberry agreed to pay off and close his accounts with Chase. It was further agreed that Mr. Castleberry would not seek to establish any new business with Chase.

On or about October 29, 2023, Chase requested and received credit reports from Experian and TransUnion pertaining to Mr. Castleberry.

At the time, the credit reports were received by Chase, a settlement agreement was in force, which prohibited Mr. Castleberry from applying for and obtaining any credit or loans from Chase, for the rest of Mr. Castleberry's natural life.

There is no evidence in this case to show that Mr. Castleberry applied for credit with Chase in October 2023.

4

## Consumer Reporting Agency (CRA) Background

The definition of a consumer reporting agency (aka credit reporting agency, credit bureau) from the Fair Credit Reporting Act (FCRA) is: "means any person [company or business] which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."[2]

The "Big 3" CRAs, Nationwide CRAs, are Equifax, Experian, and TransUnion. There are other CRAs that operate in the United States that may be lessor known, such as Innovis, Lexis-Nexis, RentGrow, Clarity Services, ChexSystems, CoreLogic Credco, SageStream, and others. The Consumer Financial Protection Bureau (CFPB), a federal regulatory agency who monitors the consumer reporting industry, has a list of over 60 credit reporting agencies that operate in the United States. The Federal Trade Commission (FTC) is another federal agency who oversees or monitors the consumer reporting industry.

The CRAs are not government agencies. The CRAs are companies who operate on a for-profit basis, and are subject to the decisions of company executives, boards of directors, shareholders, and/or stakeholders. Equifax and TransUnion are publicly traded companies on the New York Stock Exchange. Experian is a publicly traded company on the London Stock Exchange. TransUnion's headquarters is located in Chicago, IL; Equifax's headquarters is located in Atlanta, GA; and Experian's North American headquarters is located in Costa Mesa, CA.

The Big 3 CRAs compile and store data in their databases on over 200 million consumers in the United States.  This data is used to create credit files.  This data is used to create credit files and consumer reports or credit reports. CRAs sell credit reports, or information from credit files, to generate income. Consumers can purchase his or her credit file from a CRA, however, the CRAs true customers are not consumers, but Data Furnishers or Subscribers. The CRAs' primary purpose is to store credit information and to sell this information to its customers, i.e., businesses and government agencies. CRAs generate billions of dollars each year from selling consumer data to Subscribers stored within their respective databases.

## Data Furnishers / Subscribers Background

Data Furnisher / Subscribers are those companies or businesses who enter into a contractual agreement with a CRA to provide data to a CRA and/or are able to receive data from a CRA. This contractual agreement means that the business or company is "subscribing" to the service of accessing/storing/receiving the data in the database held by the CRAs. Essentially, the CRAs are the keeper of the data, and the subscribers can access the data as long as they pay the CRAs for access.  Types of Data Furnishers / Subscribers include banks, credit unions, credit card issuers, collections agencies,

---

[2] Fair Credit Reporting Act 15 U.S.C. § 1681, et seq.

mortgage lenders and servicers, and auto loan lenders. There are also public record vendors who will gather data, such as bankruptcies and tax liens, and sell this data to CRAs, so the CRAs can store the data in their database.

## Consumer Reports

The Fair Credit Reporting Act defines a consumer report as:

> "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 604 [§ 1681b]."[3]

Consumer Reports are published by CRAs. The consumer reporting industry is an integral part of the US economy and people's lives are affected by what is published in a person's credit report. Let's say you wish to purchase a home, auto, rent an apartment, or attain insurance, it is likely a credit report is involved in the decision-making process for prospective lenders or landlords. When a prospective creditor or lender requests a credit report from a CRA, the following information is typically compiled and provided in the report:

- **Personal Information of the Applicant**: Name, Address, SSN (may be redacted), Date of Birth
- **Credit History**: Account Names, Numbers, Payment History, Balance, Original Loan Amount or Credit Limit, Date Account Opened
- **Public Record Information**: Bankruptcies, Tax liens
- **Inquiries**: Hard or Soft inquiries of those entities who have received a person's credit report
- **Statements**: Fraud or Active-Duty Alert, Personalized Consumer Statement

In my opinion, most credit decisions are based upon the credit report provided to a prospective lender/landlord. The decision could be as simple as approve or decline, but other factors are affected by the credit report and score. For example, if the loan or credit is approved, these areas may be affected by the credit report and score provided: loan amount, credit limit, payment amount, deposit requirements, A.P.R. and Interest rate. Again, the credit report is an integral part of many people's lives, and it is important for the consumer report to be accurate.

---

[3] § 603. Definitions; rules of construction [15 U.S.C. § 1681a]; https://www.ftc.gov/legal-library/browse/statutes/fair-credit-reporting-act

<u>**Credit Reporting Resource Guide (CRRG)**</u>

The CRRG explains the roles and responsibilities for reporting of credit reporting data by stating: "Credit reporting information is sensitive data. The issues of accuracy and completeness of information and fairness to consumers are not just a concern of the consumer reporting agencies; credit grantor participation is also required."

The CRRG identifies specific guidelines for data furnishers to report credit information using a format called Metro 2. **Metro 2** is a standard electronic data reporting format that is used by the consumer reporting industry, CRAs and Data Furnishers, to report credit data. Metro 2 is the language used, and Metro 2 was adopted as the standard language so each entity reporting credit data can understand the information being conveyed.

Metro 2 formatting and codes are published in the "Credit Reporting Resource Guide" published and sold by the Consumer Data Industry Association (CDIA). This guide is created by the "Metro 2 Format Task Force", representatives from Equifax, Experian, Innovis, and TransUnion whose "mission is to provide a standardized method for reporting of accurate, complete and timely data." All participants, CRAs and Data Furnishers, reporting in the Metro 2 format and codes are encouraged to purchase and train with this guide.

Along with the Metro 2 language, there are messages used to transfer information. The messages are:

- **Batch Reporting** – this is the monthly reporting of credit data from the Data Furnisher to the CRA. A batch report may contain hundreds of consumers credit data compiled and reported by a Data Furnisher to the CRA.
- **Automated Consumer Dispute Verification (ACDV)** – this is an electronic message used during the dispute process. This message is generated and sent by the CRA to the Data Furnisher. Once received, the Data Furnisher is supposed to investigate the dispute and reply to the CRA with an answer.
- **Automated Universal Data (AUD)** form – this is an electronic message sent from a Data Furnisher to a CRA outside the normal monthly reporting cycle to update or delete credit data for a specific consumer.
  For example, let's say the Data Furnisher normally reports their batch information on the 5th of each month. On the 10th, the Data Furnisher's customer contacts them to update an account (maybe pay the account off). Instead of waiting until the 5th of the next month, to update the account with the CRA with batch reporting, the Data Furnisher could send an AUD to the CRA to tell the CRA to update the specific consumer's account data.
- **Carbon Copy** – this electronic message is used by a Data Furnisher to update or delete credit data for a specific consumer stored by other CRAs not involved in the ACDV dispute process.
  For example, let's say ABC company received an ACDV from a CRA, called XYZ company. After ABC company investigates and responds to XYZ company with the

7

ACDV, ABC company can also send to any other CRAs they report credit data to, the account update using a Carbon Copy.

It should be noted that the CRRG was created by the CDIA (Consumer Data Industry Association) which is not a government agency. The standards set by the CRRG are not state or federal law, and the Metro 2 format does not supersede federal law.

## Accuracy & Completeness

Senator William Proxmire, who is considered by some to be the Father of the FCRA, indicated that inaccurate and misleading information was serious problem in the credit reporting industry. He stated:

> "Perhaps the most serious problem in the credit reporting industry is the problem of inaccurate or misleading information. There have been no definitive studies made of just how accurate is the information in the files of consumer reporting agencies. Even if it is 99 percent accurate—and I doubt that it is that good—the 1 percent inaccuracy represents over a million people. While the credit industry might be satisfied with a 1 percent error, this is small comfort to the one million citizens whose reputations are unjustly maligned. Moreover, the composition of the 1 million persons is constantly shifting. Everyone is a potential victim of an inaccurate credit report. If not today, then perhaps tomorrow."[4]

Senator Proxmire further indicated that there were five types of inaccuracies where abuses were happening that required a legislative response. The five types of inaccuracies were noted as follows: the confusion of information about persons with similar or identical names, biased or one-sided information, malicious gossip and hearsay, computer errors, and incomplete information.

The Consumer Reporting Agencies and Data Furnishers are to "verify" information as part of the investigation / reinvestigation process. According to the Oxford Languages Dictionary, the word "verify" means "make sure or demonstrate that (something) is true, accurate or justified."

The Consumer Financial Protection Bureau (CFPB), who regulates the consumer reporting industry, has stated, "both furnishers and CRAs have independent obligations under the FCRA related to the accuracy of information and to the investigation of consumer disputes."[5]

In my opinion, perhaps the most important standard in consumer reporting industry is accuracy. If the consumer reporting information is inaccurate, then it can harm consumers, financial institutions, users of consumer reports, and possibly, the economy as a whole.

---

[4] 91st Congress, 1st Session 1 (1969) and FTC Decisions 1981
[5] CFPB Compliance Bulletin 2016-01, dated February 3, 2016

In the Consumer Reporting Resource Guide (CRRG), published by the Consumer Data Industry Association (CDIA)[6], the trade association for the consumer reporting industry, in the "Responsibilities and Roles" section, its states:

> "Credit reporting information is sensitive data. The issues of accuracy and completeness of information and fairness to consumers are not just a concern of the consumer reporting agencies; credit grantor participation is also required. Federal and state laws already regulate certain aspects of credit reporting. In order to protect your ability to conduct business without the further intervention of external forces, you must participate in the accuracy process.
>
> Both credit grantors and consumers depend on consumer reporting agencies to acquire and maintain accurate credit histories."

Accuracy and completeness are supposed to be a concern for both CRAs and Data Furnishers (Credit Grantors).

Further in the CRRG, the term "Accuracy" is defined:

> The 2010 FACT Act Data Furnisher rules define the term "Accuracy" to mean that information that a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer correctly:
>
> - Reflects the terms of and liability for the account or other relationship;
> - Reflects the consumer's performance and other conduct with respect to the account or other relationship; and
> - Identifies the appropriate consumer.

Accuracy's importance is emphasized throughout the consumer reporting industry through such common items as the subscriber contracts and user agreements between CRAs and Data Furnishers.

## Impact of Inaccuracies on Credit Report

In 15 U.S.C. 1681a, a "Consumer Report" is defined as "written …communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, …character, and general reputation…."

With my experience and knowledge, it is my opinion, consumers have faced certain obstacles with obtaining credit due to the misreporting on a credit report. The effects of the reporting of inaccurate information on a credit file may cause higher interest rates on loans, the reduction of credit limits on credit card accounts, higher insurance rates, denial of housing, or the possibility of not being selected for certain employment positions.

---

[6] https://www.cdiaonline.org/regulatory-compliance/. CRAs, like Experian, Equifax and TransUnion, contributed to the creation of the CRRG.

In this case, Chase inquired on Plaintiff's consumer reports and the inquiries were registered as a hard inquiries. After the date of the hard inquiries, Plaintiff's consumer reports being sent to third parties, which included the inaccurate Chase inquiry that did not belong to Mr. Castleberry, could affect his credit score, along with Mr. Castleberry's creditworthiness or character.

Data Furnishers, like Chase, are aware of the effect and consequence of credit errors to consumers. Although not every consumer may have an actual inaccuracy like Plaintiff, there have been in my experience many instances where consumers did have inaccuracies on their report. I recall listening to tens of thousands of persons on the telephone pour out their hearts and display how distraught they were over the misreported items on their credit files. I recall reading tens of thousands of letters of consumers explaining the pain and anguish they were experiencing because of the misreported items on their credit reports. I remember reading or hearing about the struggles of persons attempting to make a better life for themselves, but they could not qualify for the mortgage loan or denied rental housing to provide a good home for their family; or, they could not qualify for an automobile loan to provide reliable transportation for their family; or, they did not get the job offer for their dream job, so they could better take care of their family. All because of the incorrect items on their credit reports.

## **Credit Scores**

Credit scores are a valuable tool in the credit reporting industry. Creditors rely on credit scores in the credit decision-making process. Credit scores are typically a three-digit number which represents a person's credit worthiness. Over the years there have been many types of scores used by creditors. The scores are: Beacon, Plus Score, Credit Optics Score, RiskView Score, Anthem Score, Credit Vision Score, FICO Score and Vantage Score. One thing to keep in mind about scores is that scores can be tailored to what is important to the creditor using a specific score. An explanation of this point is shared below. FICO Scores and Vantage Scores are the most widely used scores in the credit industry. These two scores are explained further below.

FICO Score

FICO (Fair Isaac Company) was founded in the 1950s and created its first credit scoring system in 1958. In 1981, FICO introduced the first FICO credit bureau risk score. In 1991, the FICO credit bureau risk scores were made available to the Big 3 CRAs, Equifax, Experian, and TransUnion. In 2005, FICO announced it had sold its 10 millionth credit score to U.S. consumers through myFICO and its partners. In recent years, FICO scores are used by 90% of the top lenders.[7]

---

[7] https://www.myfico.com/credit-education/blog/history-of-the-fico-score ; https://www.fico.com/en/history

FICO Score has a range of 300 – 850 with a score in the higher score range allowing a consumer to qualify for many credit products.



When a creditor is evaluating whether to extend credit or not to a consumer, the FICO score model used to evaluate a consumer's credit report, will follow the criteria below:



The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters are publicly available:

---

[8] https://www.myfico.com/credit-education/whats-in-your-credit-score

**35% -- Payment history.** Late payments; i.e. credit cards, mortgages, installment loans, etc.; How overdue delinquent payments are, currently or past; Amount of money still owed on delinquent or collections accounts; Number of past due accounts, plus any public records; length of time passed since the derogatory items were reported on the credit file; number of accounts being paid on time.

**30% -- Amounts Owed.** The amount of available credit used. The amount used on all accounts listed on the credit file, plus the amount used on different types of accounts (i.e., credit cards vs. installment loans); the number of accounts that have a balance; credit utilization of revolving credit accounts (amount of credit available vs. balance).

**15% -- Length of Credit History.** The length of time credit accounts have been established and listed on the credit report (oldest account, newest account); also, the length of time since a credit account has been used.

**10% -- How Much New Credit.** Based upon research, opening numerous credit accounts in a short amount time might indicate a significant risk; a red flag to lenders.

**10% -- Credit Mix.** FICO scores consider a person's mix of types of credit, i.e., mortgage loans, retail cards, credit cards, installment loans, etc.

<u>Vantage Score</u>

In 2006, the VantageScore, a consumer credit-scoring system, was created in a joint venture of the Big 3 CRAs (Equifax, Experian, and TransUnion) and VantageScore Solutions, LLC. In my experience, skills, and knowledge, the VantageScore was created to be an alternative to the FICO Score and to compete against the FICO Score. To be clear, the FICO Score and the VantageScore are competitors, and FICO didn't assist in the creation of the VantageScore.

Initially, the VantageScore had a unique score range and used a letter system similar to the grading system used in schools.

      A: 900–990
      B: 800–899
      C: 700–799
      D: 600–699
      F: 501–599

This score range was used from 2006 to 2013, and from my experience and knowledge caused a lot of confusion amongst the public. Consumers had a difficult time understanding the VantageScore score and model. As a result, in 2013, VantageScore 3.0 was introduced with a score range of 300 – 850. In 2017, VantageScore 4.0 was introduced to the public.

The general parameters of VantageScore 4.0 are:

12

| Factor | Weight |
|---|---|
| Payment history | 41% |
| Depth of credit | 20% |
| Credit utilization | 20% |
| Recent credit | 11% |
| Balances | 6% |
| Available credit | 2% |

*Data source: VantageScore Solutions.*                                                                     9

**41% -- Payment history.** Are any late payments present on the credit report. The more late payments a person has, the more serious the impact on the score.

**20% -- Depth of credit.** Age of the credit accounts on file, i.e. average age of accounts, oldest and youngest account ages. Older accounts help the credit score. Also, measures types of credit, i.e., revolving vs. installment.

**20% -- Credit utilization.** This measures the amount of credit that is used and how much credit is available.

**11% -- Recent credit.** This measures the number of new credit accounts and the number of hard inquiries. Hard inquiries represent a credit application being submitted. Too many hard inquiries within a certain amount of time could indicate high risk.

**6% -- Balances.** This looks at the total balances on all the credit accounts, both current and delinquent. High balances can hurt the credit score.

**2% -- Available credit.** This category looks at how much credit is available on a consumer's revolving credit accounts.

In addition to the scores, when a creditor receives a score, there will typically be factors given which explain the reasons for the credit score.

There are dozens of score factors. Some examples are:

- -38 SERIOUS DELINQUENCY, AND PUBLIC RECORDS OR COLLECTION FILED (CODE 038)

- -13 TIME SINCE DELINQUENCY IS TOO RECENT OR UNKNOWN (CODE 013)

---

[9] https://www.vantagescore.com/press_releases/the-complete-guide-to-your-vantagescore/

- -27 TOO FEW ACCOUNTS CURRENTLY PAID AS AGREED (CODE 027)

- -04 LACK OF RECENT INSTALLMENT LOAN INFORMATION (CODE004)

In my experience, skills, and knowledge, factors are typically given whether the score is low or high and are given even if a person qualifies and receives the loan or credit card.

Explaining credit scores further, mentioned previously are brand name credit scores, i.e. Beacon, Plus Score, Credit Optics Score, RiskView Score, Anthem Score, Credit Vision Score, FICO Score and VantageScore. These brand name scores are the foundational scores but can be expanded into 100s of credit scores. VantageScore has four scoring models, and FICO has over 40 scoring models. Lenders can take the scoring models and tweak the algorithms to fit their business needs, meaning there are hundreds of scoring models being used in the banking and credit industry. This explains how a consumer may receive different credit scores from different sources.[10]

## Permissible Purposes of Consumer Reports

The Fair Credit Reporting Act explains when a consumer report may be furnished.[11]

The FCRA provides various reasons for when a CRA may furnisher a consumer report. The reasons are:

(1) In response to the order of a court having jurisdiction to issue such an order, a subpoena issued in connection with proceedings before a Federal grand jury, or a subpoena issued in accordance with section 5318 of title 31 or section 3486 of title 18.

(2) In accordance with the written instructions of the consumer to whom it relates.

(3) To a person which it has reason to believe—

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
(B) intends to use the information for employment purposes; or
(C) intends to use the information in connection with the underwriting of insurance involving the consumer; or

---

[10] https://www.creditkarma.com/advice/i/how-many-credit-scores-do-i-have ; https://www.bankrate.com/personal-finance/credit/different-types-of-credit-scores/ ; https://www.experian.com/blogs/ask-experian/why-do-i-have-so-many-credit-scores/#:~:text=One%20reason%20there%20are%20so,you%20check%20your%20credit%20scores.
[11] 15 U.S. Code § 1681b; https://www.law.cornell.edu/uscode/text/15/1681b

14

**(D)** intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or

**(E)** intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; or

**(F)** otherwise has a legitimate business need for the information—

    **(i)** in connection with a business transaction that is initiated by the consumer; or

    **(ii)** to review an account to determine whether the consumer continues to meet the terms of the account.

**(G)** executive departments and agencies in connection with the issuance of government-sponsored individually-billed travel charge cards.

**(4)** In response to a request by the head of a State or local child support enforcement agency (or a State or local government official authorized by the head of such an agency), if the person making the request certifies to the consumer reporting agency that—

**(A)** the consumer report is needed for the purpose of establishing an individual's capacity to make child support payments, determining the appropriate level of such payments, or enforcing a child support order, award, agreement, or judgment;

**(B)** the parentage of the consumer for the child to which the obligation relates has been established or acknowledged by the consumer in accordance with State laws under which the obligation arises (if required by those laws); and

© the consumer report will be kept confidential, will be used solely for a purpose described in subparagraph (A), and will not be used in connection with any other civil, administrative, or criminal proceeding, or for any other purpose.

**(5)** To an agency administering a State plan under section 654 of title 42 for use to set an initial or modified child support award.

**(6)** To the Federal Deposit Insurance Corporation or the National Credit Union Administration as part of its preparation for its appointment or as part of its exercise of powers, as conservator, receiver, or liquidating agent for an insured depository institution or insured credit union under the Federal Deposit Insurance Act [12 U.S.C. 1811 et seq.] or the Federal Credit Union Act [12 U.S.C. 1751 et seq.], or other applicable Federal or State law, or in connection with the resolution or liquidation of a failed or failing insured depository institution or insured credit union, as applicable.


Reviewing the information in this case, there was no evidence which indicated that in 2023 Mr. Castleberry applied for a loan or credit with Chase.

Furthermore, with the 2011 settlement agreement between Chase and Mr. Castleberry, plus Mr. Castleberry's signifier of fear, worry and concern, due to his reading of the Chase

inquires on his credit reports, the evidence in this case showed that Chase did not have authorization, or a permissible purpose, to request and receive credit reports pertaining to Mr. Castleberry.

## BASIC FACTS OF THIS CASE

Reading the information in this case, in April 2011, Chase and Mr. Castleberry executed a settlement agreement and release as a result of litigation. In the 2011 case, Mr. Castleberry was the Plaintiff and Chase was the Defendant. In the agreement, Mr. Castleberry agreed to pay off and close his accounts with Chase. It was further agreed that Mr. Castleberry would not seek to establish any new business with Chase once the settlement agreement was enacted.

5.    **Plaintiff's Representations Relating to Any Existing or Future Chase Business Relationships**

Plaintiff hereby warrants and represents that he, within sixty (60) days following entry of the Order referred to in paragraph 3 above:

A.    Will close the Accounts.

B.    Will close and pay in full (if any amounts are outstanding and due) all other existing accounts, credit card or otherwise, he has with Chase and/or Chase Related Persons.

C.    Will cease all other business relationships he has with Chase and/or Chase Related Persons.

Plaintiff also warrants and represents that he will not seek to establish any new business relationship with Chase and/or Chase Related Persons at any time after execution of this Agreement, including but not limited to relationships relating to retail banking accounts, credit card accounts, mortgages, refinances, or any extension of credit from Chase or Chase Related Persons to Plaintiff.

As can be seen from the 2011 agreement, Mr. Castleberry was to pay off and close all of his Chase accounts within 60 days, plus, Mr. Castleberry was prohibited from seeking to establish any new business with Chase.

On or about October 29, 2023, Chase requested and received credit reports from Experian and TransUnion pertaining to Mr. Castleberry.

16

•••

JPMCB CARD SERVIES got a copy of your Experian Credit Report.

**OCT 29, 2023**

JPMCB CARD SERVIES made a Bank / Credit Card Inquiry by checking your Experian Credit File. When you apply for credit, a "hard inquiry" may be placed on your Credit File and it stays on your report for 25 months.

**Source:**
Experian

```
10/29 20:02 BATUSER  DE        V11
            5335c6aac4bd45a5b1c59e646fb001b1_C    TRU**
            5335c6aac4bd45a5b1c59e646fb001b1_T    XBO**
10/29 20:02           DE        V11 CREDIT ASSESSMENT UPDATE SUCCESSFUL CB-TRU
10/29 20:02 BATUSER   UD        V11 AEGIS CREDIT ASSESSMENT UPDATE INITIATED
10/29 20:02           CR        V11 CREDIT REQUEST SUBMITTED TO AEGIS
```

At the time, the credit reports were received by Chase, a settlement agreement was in effect, which prohibited Mr. Castleberry from applying for and obtaining any new credit or loans from Chase, for the rest of Mr. Castleberry's natural life.

In this case, Chase provided the purported online credit application that was allegedly completed by Mr. Castleberry on October 29, 2023.

```
0011209DCAST488721190000023102957826923102983246S  0000000000000000001112092023        0000000000                 000000000
QQDE   FC29642      QUICK DATA ENTRY          FILENET 12/09/23 05:29
1231029578269  Nfn ARC     Dsp QDE  Next 1231029578269     Loc USPCIC
Loc US PC IC 00000 Fusa ID 231029832465___ Type _    Sp _Sol
Dt Recd 10 29 23    Src HINR Mk 61DS____Pro VPENS Merc 000000000000000000
Telemkt ID 500009339767D Tracking ID _____ OprID _____
NAME:   First    MI    Last      Jr/Sr _ Soc#     DOB   Sig DP
P ____ DOMINIC_____ _ CASTLEBERRY_____ __ ▮▮▮ 1190 _ 1963 _ _0
S _____ _ _____ __ ▮▮▮ ____ 0000 N
MMN OLVERA_____                                PRI CMID 97510016
Emb1 _____     Emb2 _____  # Cards _
CBR Parsed Address:
# 5605_  Str FAIRLANE COVE Type ___ Dir __ Apt _____ RR _____ PO _____ Ind _
Current Address: Str Adr 5605 FAIRLANE COVE
 Addl Adr _____   H Phone ▮▮▮ 4951
 City MEMPHIS_____       State TN Zip 38115___  _0 _0 O/R O
Misc Data _____ LOE _0 _0 B Phone _____ HSG Pmt _____0
EMP _____    Occ 00 Position EMPLOYED_____
Email DOM8182@GMAIL.COM
Pri Inc   Sec Inc  Other Inc  Total Ast Net Worth Chk Sav Cap Ins
_234000.00 A ___0.00 M ___0.00 A ____0 ____0 _
CL _____0 Card Type VP         S/O N N/C _ Name/Addr Change _ BT Ind N
12/02 03:43        DS     101
10/29 20:02 BATUSER  TD A104 D10 07  RB1                A104
```

Reading this electronic printout, it contained Mr. Castleberry's Personal Identification Information (PII), but there was no electronic signature or similar information on the printout, to denote that Mr. Castleberry truly applied for credit with Chase.

17

Reviewing the documents provided by Chase in this case, in my experience and knowledge, there were no documents provided which appeared to be a typical online electronic credit application. In my experience and knowledge, online applications would typically be presented in XML (Extensible Markup Language), or a similar language.

In my experience and knowledge, below are samples sample of credit applications in XML:

<u>Sample One</u>

```
<CreditApplication>
  <Applicant>
    <Name>Jane Doe</Name>
    <SSN>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</SSN>
    <DOB>1990-01-01</DOB>
    <Income>75000</Income>
  </Applicant>
  <Loan>
    <Type>Auto</Type>
    <Amount>25000</Amount>
    <Term>60</Term>
  </Loan>
</CreditApplication>
```

<u>Sample Two - Credit Application with electronic signature in XML</u>

```
<?xml version="1.0" encoding="UTF-8"?>
<CreditApplication xmlns="http://example.com/credit-application"
          xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
  <Applicant>
    <FirstName>Jane</FirstName>
    <LastName>Doe</LastName>
    <DateOfBirth>1985-06-15</DateOfBirth>
    <SSN>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</SSN>
    <Phone>+1-555-123-4567</Phone>
    <Email>jane.doe@example.com</Email>
    <Address>
      <Street>123 Maple Street</Street>
      <City>Springfield</City>
      <State>IL</State>
      <PostalCode>62704</PostalCode>
      <Country>USA</Country>
    </Address>
    <Employment>
      <EmployerName>Acme Corp</EmployerName>
      <JobTitle>Marketing Manager</JobTitle>
```

18

```
        <AnnualIncome>75000</AnnualIncome>
    </Employment>
  </Applicant>

  <LoanDetails>
      <LoanAmount>15000</LoanAmount>
      <LoanPurpose>Vehicle Purchase</LoanPurpose>
      <TermMonths>48</TermMonths>
  </LoanDetails>

  <Agreement>
      <ConsentToCreditCheck>true</ConsentToCreditCheck>
      <ElectronicSignatureConsent>true</ElectronicSignatureConsent>
      <ApplicationDate>2025-07-25</ApplicationDate>
  </Agreement>

  <ds:Signature>
      <ds:SignedInfo>
          <ds:CanonicalizationMethod Algorithm="http://www.w3.org/TR/2001/REC-xml-c14n-20010315"/>
          <ds:SignatureMethod Algorithm="http://www.w3.org/2000/09/xmldsig#rsa-sha256"/>
          <ds:Reference URI="">
            <ds:Transforms>
                <ds:Transform Algorithm="http://www.w3.org/2000/09/xmldsig#enveloped-signature"/>
            </ds:Transforms>
            <ds:DigestMethod Algorithm="http://www.w3.org/2001/04/xmlenc#sha256"/>
            <ds:DigestValue>...</ds:DigestValue>
          </ds:Reference>
      </ds:SignedInfo>
      <ds:SignatureValue>
          ABCDEFGHIJKLMNOPQRSTUVWXYZ1234567890==
      </ds:SignatureValue>
      <ds:KeyInfo>
        <ds:X509Data>
            <ds:X509Certificate>MIID...certificate-content...AB==</ds:X509Certificate>
        </ds:X509Data>
      </ds:KeyInfo>
  </ds:Signature>
</CreditApplication>
```

Sample Three
Another language that could be used is JSON (JavaScript Object Notation). A sample of this language is:

```
{
  "applicant": {
    "name": "Jane Doe",
    "ssn": "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",
    "dob": "1990-01-01",
    "income": 75000
  },
  "loan": {
    "type": "auto",
    "amount": 25000,
    "term": 60
  }
}
```

The documents provided by Chase[12] in this case did not contain either XML or JSON languages, and the documents Chase provided were dated December 9, 2023, not October 29, 2023, the date the credit application Mr. Castleberry supposedly submitted.

## Chase documents (Bates 014 – 044)

Further reading these documents, some entries stood out. Note that many of the documents provided showed numerous blank entries on the forms, which in my opinion, was unusual.

Decision Summary



The Decision Summary reported Applicant's Income as $19,500, and the requested credit amount was shown as $5,000.  Also noted was the Credit Bureau Summary indicated zeros, no score numbers.

---

[12] Bates 014 – 044

## Scores Screen

```
0011209DCAST4887211900000231029578269231029832465  0000000000000000I12092023
QCP5    FC296F6           SCORES SCREEN                    FILENET  12/09/23 05:29
I231029578269   Nfn ARC        Dsp CP5  Next I231029578269           Loc USPCIC
CASTLEBERRY, DOMINIC                                      BATUSER  12/03/23
5605 FAIRLANE COVE                      ████████1190
MEMPHIS, TN 38115                            - -      VPEWS                    TD
CREDIT BUREAU SCORES:
   CORE:    SCORE:   000     SEGMENT:    0   REASONS:    ___  ___  ___
   STU:     SCORE:   000     SEGMENT:    0   REASONS:    ___  ___  ___
   INT:     SCORE:   000     SEGMENT:    0   REASONS:    ___  ___  ___
   LPSP:    SCORE:   000     SEGMENT:    0   REASONS:    ___  ___  ___
   BK:      SCORE:   0000    SEGMENT:    0   REASONS:    ___  ___  ___
   BUSINESS: SCORE:  000     SEGMENT:        REASONS:    ___  ___  ___
   CP05 CUTOFFS: TIER1:   000     TIER2:  000  TIER3:   000
   PL:      SCORE:   000     SEGMENT:    0   REASONS:    ___  ___  ___
STRATA:     SCORE:   000     MODEL:      _   REASONS:    ___  ___  ___
   SBARS:   SCORE:   000     SEGMENT:    0   REASONS:    ___  ___  ___
BUSINESS BLENDED: SCORE:  _____  CUTOFF: TIER1:   0  TIER2:   0  TIER3:   0
REASONS:    ___
SOLICITATION SCORES:
            SCORE:   000     SEGMENT:    0   MODEL:    _
   BK: SCORE:   0000    SEGMENT:    0
BDFS:  SCORE:  000  REASONS:   ___ ___ ___ ___
```

As can be seen from reviewing this document, the scorecards contained zeros. Typically, scores, segments, and reasons would have entries. The score cards were segmented into what I call consumer types or loan types. Segments are used to evaluate consumer reports and typically generate raw scores. The raw scores would then be compiled and converted into a score that we would typically see in a range from 300 to 850. Examples of Segments are: students, low prime/sub-prime, personal loan, bankruptcy, and installment loan. In my experience and knowledge, a Credit Risk Model will evaluate a consumer's credit file based upon the segments the creditor wants to use. In my experience and knowledge, Credit Risk Models are created and designed in advance based upon the Score company (i.e., FICO, Vantage, etc.) and the creditor's collaboration.

## Miscellaneous Data

### *Total Annual Income*

```
BO CIP STATUS              :
TOTAL AGGREGATE ANNUAL INCOME   :  $     234,000.00
TOTAL ANNUAL TAXABLE INCOME     :  $     234,000.00
TOTAL ANNUAL NON-TAXABLE INCOME :  $           0.00
```

Furthermore, the total income shown on the Chase documents was indicated as $234,000. This would mean that the applicant's total income, i.e., wages, tips, bonuses, commission, capital gains, dividends, alimony, pension payments, interest income, and rental income, was $234,000. At the time of writing this report, it was not known where Chase attained the income figures shown in the documents provided in this case.

*TALX[13] Applicant Gross Annual Income*

```
TALX INCOME SOURCE SUBSCRIBER NAME:
TALX APPLICANT GROSS ANNUAL INCOME :      99,999,999,999.99
TALX INCOME REPORTED DATE         :      2099-12-31
TALX INCOME REQUEST TYPE CODE     :      01
```

In this section, it indicated that the applicant's gross annual income was approximately $99 billion dollars, and the date this income was reported was December 31, 2099.

Reading the documents, there were three different incomes for the applicant, $19,500; $234,000; and $99 billion plus. Plaintiff has stated that in 2023, his income was about $25,000, that amounbt was significantly different from the amounts Chase had in their documents for Plaintiff, which, in my opinion, the amounts were nonsensical and seemed to come from nowhere. With my experience and knowledge, it is my opinion that the documents provided by Defendant in this case contained flaws and inaccuracies. It is my opinion, with the inaccuracies associated with the alleged credit application from Mr. Castleberry, this information demonstrated Chase's unreliability.

From reading the Chase documents (Bates 014 – 044), these documents were dated in December 2023, and created after the credit application was allegedly submitted in October 2023. It is my opinion, the documents were a summary of application process, but not the credit application itself that was allegedly submitted on October 29, 2023.

In my opinion, these documents do not show any where that a person truly applied for credit with Chase in October 2023. Since Chase has not provided a copy or proof of an application from October 29, 2023, it is my opinion that Chase lacked the authorization or permissible purpose to access Mr. Castleberry's credit files with Experian and TransUnion. Plus, based upon reading the evidence in this case, it is my opinion that Mr. Castleberry did not apply for credit with Chase in October 2023, but the Chase inquiries were caused by an anomaly in Chase's system.

## **Inaccuracy and Harms to Mr. Castleberry's Creditworthiness**

As it relates to the impact of the Chase inquiries on Mr. Castleberry's consumer reports, in my experience and knowledge may be impacted in various ways.   A hard inquiry on a consumer's credit report can have several impacts, primarily to a consumer's credit score[14] and a consumer's creditworthiness perception by lenders.

---

[13] TALX (now known as Equifax Workforce Solutions) refers to a service used by lenders and other financial institutions to quickly and securely verify an applicant's employment and income.  https://hr.nih.gov/hr-systems/talx#:~:text=Overview,the%20credit/loan%20application%20process.
[14] https://www.myfico.com/credit-education/credit-reports/credit-checks-and-inquiries

Credit score

Depending on the consumer's overall credit profile, in my experience and knowledge, a credit score can be reduced between 5 – 8 points.[15] [16] An inquiry is typically visible for two years, but most scoring models only consider inquiries on a consumer's file in the last 12 months from the date of a loan or credit application.

Lender Perception

Hard inquiries can raise red flags with lenders.  Inquiries may suggest to a creditor financial distress or risk-taking behavior pertaining to a consumer. In my experience and knowledge, a hard inquiry indicates to lenders that a consumer is actively applying for new lines of credit, and lenders will perceive that a consumer is potentially taking on new debt, which could mean a risk.[17]

## Conclusion

In my opinion, Chase requested and received consumer reports about Mr. Castleberry without authorization from Mr. Castleberry or with a permissible purpose.  It is clear by the 2011 settlement agreement between Chase and Mr. Castleberry that Mr. Castleberry was prohibited from having any new business activities with Chase beginning in 2011, and Chase failed to have mechanisms in place, so it could adhere to the settlement agreement. In my opinion, Chase should have flagged Mr. Castleberry's information in its system to note that Chase and Mr. Castleberry were not to engage in any new business activities, such as banking, credit, loans, etc., after the 2011 settlement agreement was enacted.

Plaintiff, along with over 200 million other consumers in the United States with consumer reports, are counting on Defendant Chase, to ensure it only inquires and accesses consumer credit files with authorization or permissible purpose.

If appropriate, and if justified by the production of additional evidence or discovery, I reserve the right to supplement this report at a future date.

---

[15] https://www.experian.com/blogs/ask-experian/how-many-points-does-an-inquiry-drop-your-credit-score/
[16] https://www.nav.com/blog/how-many-points-does-a-hard-inquiry-affect-credit-my-credit-score-188062/
[17] https://www.discover.com/credit-cards/card-smarts/too-many-credit-inquiries/#:~:text=Any%20hard%20credit%20inquiry%20may,extended%20and%20a%20risky%20borrower.

23

## **FEES**

My fee for a Credit Expert report is $4,000.

My fee is $300 per hour for testimony preparation, consulting, additional reports or declarations; and

My fee is $400 per hour, or a minimum of $1200 per day, for deposition, with $500 for preparation of said testimony; both the $1200 amount and $500 amount are due in advance of said testimony, plus reasonable travel time, plus travel costs and expenses.

By requesting my appearance at a deposition, it is agreed to pay me for the entire time I spend at the deposition, including breaks, as well as my $500 preparation fee.

My compensation is not contingent on the outcome of this case.

## **MATERIALS CONSIDERED**

Plaintiff's counsel provided the following materials which I considered, together with my experience and knowledge, in forming the opinions expressed herein:

1. Plaintiff's Complaint, U.S. District Court, Eastern District of Texas (Case: 4:24-cv-00793)
2. Plaintiff's produced documents
3. Chase's produced documents
4. Declaration of Terria Benson
5. Chase's Responses to Discovery
6. Fair Reporting Credit Act, 15 U.S.C. § 1681, et seq.

**Respectfully submitted and executed this 4th day of August, 2025 in Aubrey, Texas**

Douglas A. Hollon
Credit Experts of North Texas, LLC
1101 Mockingbird Dr
Aubrey, TX 76227

24

### Testimony

Andrew F. Smith ***v. Experian Information Solutions, Inc.,*** American Arbitration Association, Case Number: 01-24-0007-5081. Testimony. (2024)

Bianca M. Jones ***v. Nelnet Servicing, LLC***, U.S. District Court, Western District of Tennessee (Memphis Division) (Case: 2:24-cv-02325). Expert Report. Testimony (2025)

Ronald A. Garcia Delgado ***v. Experian Information Solutions, Inc.*** U.S. District Court, Eastern District of Texas (Sherman Division) (Case: 4:24-cv-00637). Expert Report. Testimony (2025)

Oleksandr Panchenko ***v. Comenity Capital Bank, and Bank of America, N.A.***; U.S. District Court, Northern District of California (Case: 5:23-cv-04965-BLF). Expert Report. Testimony (2025)

Marcelino Albuerne and Ruby Jenkins ***v. Rent Recovery Solutions, LLC;*** U.S. District Court, District of Kansas (Case: 5:24-cv-04043). Expert Report. Testimony (2025)

Michael R. Libbra ***v. Experian Information Solutions, Inc. and TransUnion, LLC,*** U.S. District Court, Central District of Illinois (Case: 3:23-cv-03298-CRL-KLM). Expert Report. Testimony (2025)

Tamara Allen ***v. Experian Information Solutions, Inc. and USAA Federal Savings Bank,*** U.S. District Court, Southern District of Texas (Houston Division) (Case: 4:23-cv-03406)

Ivy Acorin ***v. Wells Fargo Bank, NA***, U.S. District Court, Southern District of California (Case: 3:24-cv-00034-AJB-BLM). Expert Report. Testimony (2025)

Alana Cimillo **v. *Experian Information Solutions, Inc.,*** Judicial Arbitration and Mediation Services (JAMS), (JAMS Reference Number: 5425001310). Expert Report. Testimony (2025)

Alycia Johns ***v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; Nelnet; First Premier Bank: TransUnion, LLC; LVNV Funding; et al.***, U.S. District Court, Eastern District of Pennsylvania (Case: 2:22-cv-04791-KBH) Expert Report. Deposition. (February 2025)

Alycia Johns ***v. TransUnion, LLC; Experian Information Solutions, Inc.; Equifax Information Services, LLC; Nelnet; First Premier Bank:; LVNV Funding; et al.***, U.S. District Court, Eastern District of Pennsylvania (Case: 2:22-cv-04791-KBH) Expert Report. Deposition. (January 2025)

Richard Leroy Brasmer ***v. Experian Information Solutions, Inc.*** U.S. District Court, Eastern District of Washington (Case: 2:24-cv-00063). Expert Report. Deposition. (2025)

Cecelia Colette Grant ***v. Experian Information Solutions, Inc.,*** American Arbitration Association, (Case Number 01-24-0004-3912), Testimony (2025)

James Breitenbach ***v. SageStream, LLC,*** U.S. District Court, Eastern District of Pennsylvania, (Case: 2:24-cv-00893). Expert Report. Deposition. (2024)

25

Demetre Durham ***v. Experian Information Solutions, Inc., et al.,*** U.S. District Court, District of Hawaii Case: 1:23-cv-00255-JAO-KJM). Expert Report. Deposition. (2024)

Saran Nuth and Kevin O'Neill ***v. Newrez LLC dba Shellpoint Mortgage Servicing, and Experian Information Solutions, Inc. et al.***, U.S. District Court, Northern District of California (Case: 3:23-cv-03476-WHA). Expert Report. Deposition. (2024)

Austin Stuart Fraase ***v. Advantage Credit Bureau,*** U.S. District Court, District of North Dakota (Eastern Division) (Case: 3:23-cv-00117-ARS). Expert Report. Deposition. (2024)

James N. Osborne ***v. RentGrow, Inc.***, U.S. District Court, District of Massachusetts (Case: 1:23-cv-10572) Expert Report. Deposition. (2024)

Alexandra Husted-Mai ***v. Hunter Warfield, Granite Management, LLC, and Tailwind West Lafayette***, LLC, State of Indiana, Circuit Court of Tippecanoe County (Cause No. 79C01-1908-CT-000114) Trial Testimony. (2024)

Daniel Wright ***v. HireRight, LLC,*** U.S. District Court, District of Arizona (Case: 2:23-cv-00493-SMM) Expert Report. Deposition. (2024)

Shane W. Young ***v. Experian Information Solutions, Inc., and First Advantage Background Services Corp.,*** U.S. District Court, Northern District of Illinois (Western Division) (Case: 3:22-cv-50222) Expert Report. Deposition. (2024)

Crystal Lovelady ***v. Experian Information Solutions, Inc., and General Business Recoveries, Inc.,*** U.S. District Court, District of Arizona (Case: 4:23-cv-00136-SHR). Expert Report. Deposition. (2024)

Ernest Lee Duncan, Jr. ***v. Experian Information Solutions, Inc.,*** JAMS Arbitration, Ref. No. 5410000458. Testimony. (2024)

Fabian Huizar ***v. TransUnion, Inc.,*** U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00086-PPS-JEM) Expert Report. Deposition. (2024)

Fabian Huizar ***v. Horizon Bank,*** U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00060-PPS-JEM) Expert Report. Deposition. (2024)

Fabian Huizar ***v. Experian Information Solutions, Inc.,*** U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00085-PPS-JEM) Expert Report. Deposition. (2024)

Fabian Huizar ***v. Equifax Information Services, LLC,*** U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00090-PPS-JEM) Expert Report. Deposition. (2024)

Lawrence Whaley ***v. RentGrow, Inc.,*** U.S. District Court, District of South Carolina (Case: 2:23-cv-01393-DCN). Expert Report. Deposition. (2024)

Sean Algaier ***v. Credit Control Services, Inc., et al.,*** U.S. District Court, Western District of North Carolina (Case: 3:22-cv-00475-RJC-DCK). Expert Report. Deposition. (2023)

Aaron Rubin *v. US Bank Home Mortgage, Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC.,* U.S. District Court, Western District of New Jersey (Case: 3:22-cv-00906-FLW-DE). Expert Report. Deposition. (2023)

Lyla Stephens *v. Experian Information Solutions, Inc.,* American Arbitration Association, Case Number: 01-22-0003-5590. Expert Report. Deposition. (2023)

Melissa L. Walker *v. Missouri Higher Education Loan Authority, Equifax Information Services, LLC, and TransUnion, LLC, U.S.* District Court, Eastern District of California (Case: 1:21-at-00607). Expert Report. Deposition. (2023)

Zavian Allen *v. Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC, and Innovis Data Solutions, Inc., et al.,* U.S. District Court, Eastern District of Texas (Sherman Division) (Case: 4:22-cv-00128-ALM). Expert Report. Deposition. (2023)

Eunice Hernandez *v. Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC, and Innovis Data Solutions, Inc., et al.,* U.S. District Court, Eastern District of Texas (Case: 4:22-cv-00455-SDJ). Expert Report. Deposition. (2023)

Erin Livesay *v. National Credit Systems, Inc., U.S.* District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-19-TLS-JEM). Expert Report. Deposition. (2023)

Mark Cebrynski and Kristen Cebrynski *v. Wells Fargo Bank, N.A., and Experian Information Solutions, Inc.,* U.S. District Court, District of Arizona (Case: 2:21-cv-01965-DJH). Expert Report. Deposition. (2023)

Genaris Haston *v. Gold Coast Federal Credit Union, et al.,* U.S. District Court, Southern District of Florida (Case 9:22-80004-CIV-SMITH). Expert Report. Deposition. (2022)

Jeff Wellemeyer *v. TransUnion, LLC, et al,* U.S. District Court for the Western District of Kentucky, Louisville Division (Case number: 3:20cv814 DJH-LLK). Expert Report. Deposition. (2022)

Thomas Lynch and Rosemary Nelson *v. Experian Information Solutions, Inc.,* U.S. District Court, District of Minnesota (Case 0:20-cv-02535). Expert Report. Deposition. (2022)

Matthew Koerner *v. Santander Consumer USA, Inc. and Equifax Information Services, LLC and Experian Information Solutions, Inc., and Trans Union, LLC,* U.S. District Court for the Northern District of Illinois (Case 1:20-cv-522). Expert report. Deposition. (2021)

John D. Myers, on behalf of himself and those similarly situated, *v. Equifax Information Services, LLC and Experian Information Solutions, Inc., and Trans Union, LLC,* U.S. District Court for the Southern District of Indiana (Case 1:20-cv-00392-JMS-DLP). Expert report. Deposition. (2021)

27

# DOUGLAS A. HOLLON

469.544.4792 | doug@hollon.biz

---

## CREDIT EXPERT

### CORE COMPETENCIES AND ACHIEVEMENTS

**CDIA FCRA Certifications**
**NYIF Credit Analyst Certificate**
**SAS Credit Risk Modeling and Credit Score Development**
**American Bankers Association Lending Compliance Certificate**
**Trial Testimony.** Provided crucial testimony about a data furnisher in an FCRA case which resulted in a $2.25 million jury verdict for the Plaintiff/Client.
**Arbitration Testimony.** Provided crucial testimony about a CRA in an FCRA case which resulted in a $1.1 million decision for the Plaintiff/Client.
**30(b)(6) Corporate Representative Witness.** Testified on behalf of company; having specialized knowledge of company policies, procedures and operations.
**Credit Reporting Analysis.** Analyzed tens of thousands of credit reports in order to help customers.
**Credit Score Analysis.** Analyzed thousands of credit scores in order to help consumers and others.
**E-Oscar.** Reviewed and studied e-Oscar reporting from companies to ensure accuracy.
**Compliance.** Reviewed laws and regulations and reviewed company processes to ensure compliance.
**Public Speaking.** Invited to speak at Credit Con 2022, along with another credit expert, plus speaking event at Paul Quinn College.
**Investigative techniques.** Learned and applied investigative techniques to various crime scene situations and criminal cases.
**Contact Center Operations.** Helped customers by telephone and mail resolving complaints.
**Customer Service.** Diffused hundreds of escalated customer interactions with peaceful resolutions. Red carpet service.
**Effective Communication.** Listened to customers and asked questions to understand in order to best assist them.
**Coaching.** Guided dozens of people in leadership and management skills to help with their success.
**Legal Research and Analysis.** Reviewed and studied pre-litigation complaints, company documents, and explained results to company legal personnel.
**Contract Management.** Studied government (FAR) and commercial contracts. Master's Certificate Contract Management, Villanova University

### PROFESSIONAL EXPERIENCE

**CREDIT EXPERTS OF NORTH TEXAS, LLC** | Aubrey, TX | 2020 - Present
President/Owner

- Prepare Expert Witness Reports
- Analyze litigation case documents
- Legal Research
- Deposition and Trial Testimony
- Compliance
- Consultation/Training/Speaking

**EXPERIAN** | Allen, TX | 2005–2019
**Credit Reporting, Compliance**
- 30(b)(6) Corporate Representative Witness (2016-2018) Testified on behalf of company; having specialized knowledge of company policies, procedures and operations.
- Analyzed and defused escalated customer situations to prevent lawsuits by managing processes from beginning to end
- Provided leadership advice to current supervisors based on observation of company operations increasing department efficiency
- Maintained relations between high profile customers and company reassuring customers that their information is secure and safe as the Project Manager for High Profile Security Breach
- Developed close relationships with customers in order to resolve their issues by learning various personalities and how to interact
- Government Liaison to Congressmen, managing customer cases and providing in-depth reports
- Managed security breaches involving high profile consumers, creating policies and procedures to prevent future breaches
- Processed subpoena requests as the Custodian of Records for Federal Courts, State Courts, IRS, etc.

**U.S. ARMY** | Germany | 1989 – 2005
**Senior Paralegal, CID Agent**
- Top Secret SCI clearance
- Investigated General Crimes and Economic Crimes
- Supervised operations for Prosecutor's office, including 7 branch offices, overseeing over 15 personnel (this office had the largest criminal case load in the Army for the years I was there)
- Maintained an overall office budget, including supplies, equipment, and travel, totaling over $40,000
- Implemented and manage computerized file tracking system, providing 100 % accountability of all pending cases
- Updated office filing system for files up to 10 years old increasing capacity
- Non-Commissioned Officer of the Year candidate for military installation

## EDUCATION AND CERTIFICATIONS

**Bachelor of Science in Business Finance** | Liberty University | Lynchburg, VA | Honors
**Bachelor of Arts in Religion**, Bethany Divinity College and Seminary | Dothan, AL | Summa Cum Laude
**Master's Certificate in Contract Management** | Villanova University | Villanova, PA
**Ziglar Legacy Certified Trainer**
**D.I.S.C. Personality Profile Certified Trainer**
**NYIF Credit Analyst Certificate**
**CDIA FCRA Certifications**
**SAS Credit Risk Modeling and Credit Score Development**
**American Bankers Association Lending Compliance Certificate**

## TECHNICAL SUMMARY

Series 6 License, Microsoft Word, Excel, PowerPoint, Outlook, and Customer Relationship Management System, Public Speaking; Training Facilitator, Notary Public